The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SAMY HAMILTON HERRARTE GARCIA,<br><br>Petitioner,<br><br>v.<br><br>GLERCY ROSARIO DUARTE REYNOSA,<br><br>Respondent. | Nos. 2:19-cv-01928-RAJ<br><br>**ORDER GRANTING PETITION FOR RETURN OF CHILDREN** |

This matter is before the Court on Petitioner Samy Hamilton Herrarte Garcia's Petition for Return of Children filed pursuant to the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("the Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 ("ICARA"). Dkt. # 1. The Court held a bench trial on this matter over the course of three days from February 10, 2020 to February 12, 2020. For the following reasons the Court **GRANTS** the Petition. Dkt. # 1.

ORDER – 1

# I. FINDINGS OF FACT[1]

Samy Hamilton Herrarte Garcia ("Petitioner") and Glercy Rosario Duarte Reynosa ("Respondent") are the parents of S.C.H.D., age 6, and J.A.H.D., age 3, the two minor children who are the subject of this litigation. Both parties were born in Nuevo Concepcion, Guatemala. Petitioner was raised on a cattle ranch in Nuevo Concepcion and attended university at Rafael Landivar University. Respondent was also raised in Nuevo Concepcion, and later attended school in Burien, Washington for several years before returning to Guatemala.

In 2013, the parties met and began cohabitating together in a home in Guatemala. Although they never married, the parties had three children together, S.C.H.D., A.E.H.D., and J.A.H.D. The parties' oldest child, S.C.H.D., was born on July 8, 2013. The second child, A.E.H.D., was born on June 14, 2015, but died shortly after birth. The parties' youngest child, J.A.H.D. was born on August 29, 2016. All the children were born in Guatemala. The family lived in a home together in Nuevo Concepcion, near Petitioner's parents, until February 2019. S.C.H.D. attended school in Nuevo Concepcion.

The parties paint vastly different pictures of their relationship. During the trial, they traded accusations and denials of spousal abuse. Respondent testified that Petitioner physically abused her many times, often in the presence of S.C.H.D.. Petitioner denies any allegations of physical abuse, although he admits that the parties often engaged in heated verbal arguments. The Court attempts to summarize the parties' contentions below.

---

[1] The Court permitted telephonic testimony from several witnesses in order to accommodate the Convention's requirement that district courts "act expeditiously in proceedings for the return of children." Convention, art. 11. *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013) (finding a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition under the Convention.).

### A. **Allegations of Abuse**

Respondent described several allegations of physical abuse by Petitioner. Respondent testified that the first incident occurred in 2013 when she was six-months pregnant with S.C.H.D. She testified that one night Petitioner did not come home, and she called his father to enquire as to his whereabouts. When Petitioner returned home he was angry that she had called his father and began hitting her many times with his fist on her face, body, and legs. According to Respondent, Petitioner was intoxicated at the time. Because of the abuse, Respondent testified that she suffered bruising across her body and she did not leave the house because she did not want anyone to see her like that. Petitioner denies the incident.

The next incident of abuse occurred in June 2015 when Respondent was seven-months pregnant with the parties' second daughter. Respondent testified that Petitioner came home intoxicated again and began yelling at her. The exchange escalated, and Petitioner picked up a broomstick and threw it at her as she attempted to flee, hitting her in the leg and causing her to fall. S.C.H.D. was present and witnessed the exchange. Two or three days after the incident, Respondent began to experience early labor pains and was admitted to the hospital. The parties' second child, A.E.H.D., was born shortly thereafter, nearly two months premature. The child died one week later. Prior to the alleged abuse, Respondent testified that her pregnancy was normal. Petitioner vigorously denies the abuse and testified that Respondent was having complications during her pregnancy with A.E.H.D. prior to the alleged assault.

The next incident of violence occurred in late 2015. Respondent testified that the parties got into a verbal argument because Petitioner had instructed Respondent to fill his car with gas and she had not done it. Respondent said that Petitioner became very angry that she had not filled the car with gas and hit her on the head with the handle of a gun. Respondent said that S.C.H.D. was present and witnessed the encounter. After he hit her, Respondent fled to her mother-in-law's house, with the child. Respondent's

mother-in-law cleaned her wound and asked her not to say anything to anyone else about what had happened and promised to talk to Petitioner. Respondent testified that she was upset because her mother-in-law told Petitioner that he should only hit Respondent with a belt, not a gun. Respondent offered a photograph of a scar that she said was a result of the incident.

Respondent described another incident when Petitioner was intoxicated and threatened her. Respondent ran out of the house and Petitioner chased after her, shooting his gun into the air. At the time, Respondent was holding S.C.H.D., who was approximately one-year old. According to Respondent, Petitioner was laughing as he chased her. Respondent's family friend, Glendy Galino, also testified that she has witnessed Petitioner shoot his gun into the air with other men during community horse events. Petitioner denies ever taking his gun out of the house, noting that he does not have a license to carry a firearm and that it is illegal in Guatemala to shoot a gun into the air.

In April 2018, the parties engaged in another heated exchange and Respondent testified that she left the home with the children and went to her sister's house. She also obtained a domestic violence restraining order from the police in Nueva Concepcion. Respondent and her sister testified that Petitioner came to the house several days later, despite the restraining order, and asked Respondent to come home with assurances of that he would change. Respondent agreed to return home with Petitioner.

The final instance of abuse occurred in February 2019. Respondent testified that Petitioner came home intoxicated and when she complained to him about being unfaithful to her, he became upset and shoved her. According to Respondent, S.C.H.D. pleaded with Petitioner to stop and he did. Respondent said the child was scared and

crying. Approximately one week later, on February 27, 2019, Respondent fled Guatemala with both children.[2]

Respondent sent Petitioner a text message informing him that she was taking the children and asking him not to look for them. Petitioner testified that Respondent also left a handwritten note in which she stated that she was leaving because she wanted material things. Petitioner denies writing the note. After learning of the children's removal, Petitioner filed an Alba-Keneth missing child report for both children in Guatemala. Petitioner subsequently learned that Respondent and the children were in Washington. He contacted the Central Authority in Guatemala and submitted an application for the Request for Return of Children. Since then, Petitioner and Respondent have had sporadic communications. Petitioner testified that he has not had regular contact with his children since they were removed from Guatemala. On November 24, 2019, Petitioner filed the instant Petition for Return of Children under the Convention. Dkt. # 1. Petitioner also filed an *ex parte* motion for a temporary restraining order. Dkt. ## 6. On January 22, 2020, the Court issued an order granting in part and denying in part Petitioner's motion for emergency relief. Dkt. # 27.

## II. CONCLUSIONS OF LAW

### A. The Hague Convention and ICARA

Petitioner brings this petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011, the United States statute that implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49. The purpose of the Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and ... to ensure that rights of custody and of access

---

[2] In August 2019, Ms. Duarte Reynosa applied for asylum and a hearing on her asylum application is set for February 22, 2022.
*(continued)*

ORDER – 5

under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1. Both the United States and Guatemala are signatories to the Convention.[3] "When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (citations omitted).

### i. *Prima Facie* Case

To establish a *prima facie* case for the return of a child, the petitioner must demonstrate by a preponderance of the evidence that: (1) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. 22 U.S.C. § 9003.

The parties do not dispute that Petitioner has established a *prima facie* case of wrongful removal under the Convention. The minor children, S.C.H.D. and J.A.H.D., are both under the age of 16 and the parties agree that the children's country of habitual residence is Guatemala. Respondent also concedes that she removed the children in breach of Petitioner's custody right and that Petitioner was exercising his custody rights over the children at the time of removal. Thus, the only remaining question is whether Respondent can establish an affirmative defense to wrongful removal under the Convention.

### ii. Article 13 Affirmative Defenses

Once a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent who may assert certain affirmative defenses. There are several

---

[3] See U.S. Dept. of State, "U.S. Hague Convention Treaty Partners," available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Feb. 14, 2020).

affirmative defenses set out in the Convention, which must be narrowly construed. Convention, art. 13. This Court's analysis will focus on the only defense raised by Respondent, the "grave risk" exception.

### iii. Grave Risk

Respondent argues that the children will be in grave risk of harm if returned to Guatemala. Under Article 13 of the Convention, a child should not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). The burden is on Respondent to prove this defense by clear and convincing evidence. The grave risk exception should be narrowly drawn. *Cuellar v. Joyce*, 596 F.3d 505, 508–09 (9th Cir. 2010) (internal citation omitted). Petitioner argues that the evidence does not establish that the children will face a grave risk of harm if returned to Guatemala. Petitioner contends that Respondent's allegations of abuse are "self-serving" and unsupported. Petitioner also notes that Respondent has introduced no evidence that he ever physically harmed the children.

To meet her burden under the "grave risk" exception, Respondent must establish that the alleged physical or psychological harm is "a great deal more than minimal." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). Indeed, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him [or her] to another." *Id.* (internal quotation marks omitted). Courts are not to engage in a custody determination or to address questions such as who would be the better parent in the long run. *Id.*

Respondent alleges that Petitioner physically abused her on multiple occasions, frequently in the presence of their daughter. The Court finds Respondent's testimony regarding the abuse and her fear of Petitioner, highly credible. Many of these allegations are corroborated with other evidence or testimony. However, based upon the evidence, it appears that the abuse was primarily directed at Respondent, not the children.

ORDER – 7

Respondent testified that S.C.H.D. was present on three of the occasions of spousal abuse, but there is no evidence that S.C.H.D. was harmed during any of these altercations. On one occasion, S.C.H.D. begged Petitioner to stop and he did. Respondent's only evidence of the risk of physical harm to the children is testimony regarding Petitioner's violent tendencies and her fear that he might harm the children at some point in the future if they upset him. This is insufficient.

In similar cases, other courts have repeatedly found that allegations of domestic abuse, directed solely at the mother, are generally insufficient to establish a "grave risk" under the Convention. *See, e.g., Avendano v. Smith*, 806 F. Supp. 2d 1149 (D.N.M. 2011) (admitting that there was evidence that the father raped and abused the mother, but noting that these were isolated incidents not aimed at the children); *McManus v. McManus*, 354 F. Supp. 2d 62 (D. Mass. 2005) (holding that "two incidents" of a mother striking two of her four children and a generally chaotic home environment was insufficient to establish a grave risk of harm because it did not show "a sustained pattern of physical abuse"); *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (stating that a husband's "verbal abuse and an incident of physical shoving" directed at his wife did not establish a grave risk to the child, especially where there was no allegation that the father had abused the child physically or psychologically); *Tabacchi v. Harrison*, 2000 WL 190576 (N.D. Ill. Feb. 10, 2000) (finding no grave risk to children where the wife offered evidence of her husband's history of repeated physical and verbal abuse, including violent arguments, throwing items, hitting and slapping her on the head, grabbing her and throwing her to the ground, and choking her and her PTSD resulting from these incidents).

The Court does not discount the potential for psychological harm to children in cases of spousal abuse. Unfortunately, Respondent offers almost no evidence of this. Although S.C.H.D. was present during several of the altercations and begged Petitioner to stop on one occasion, neither party requested a psychological evaluation of the

children to assess the effects of witnessing the abuse. There is simply insufficient evidence to satisfy the narrow "grave risk" exception. *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) ("[T]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. Rather, the question is whether the child would suffer serious abuse, that is a great deal more than minimal.") (internal citations and quotation marks omitted).

This case is a difficult one. The Court does not take Respondent's testimony regarding Petitioner's abuse lightly. She describes incidents of brutality that, if true, are deeply disturbing. Unfortunately, the case law imposes a high burden to satisfy the grave risk exception. Respondent has not shown by "clear and convincing" evidence that there is a grave risk that *the children* will face a grave risk of physical or psychological harm if returned. The Court's hands are tied — the children must be returned to Guatemala.

Having determined that the Petition must be granted, the Court feels that additional comments are necessary. The case law is clear that courts reviewing these petitions must limit their analysis to the merits of the claim for wrongful removal and may not consider any underlying custody issues. But nothing in this decision should be interpreted as diminishing Respondent's very serious allegations of abuse. As discussed above, the Court found Respondent's testimony highly credible; in the end, there was simply insufficient evidence to establish a grave risk of harm to the children. The Court trusts that the court in Guatemala will consider the seriousness of Respondent's allegations of abuse in making its final custody determination.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** the petition. Dkt. # 1. It is hereby ORDERED:

1. The Petition for Return of Children pursuant to 42 U.S.C. § 11601 is GRANTED. Respondent is hereby ORDERED to facilitate the timely return of the children back to Guatemala.
2. The Court understands that Respondent is currently engaged in immigration proceedings that may limit her ability to leave the United States. Accordingly, the Court will provide Respondent with two options:
   a. Respondent may return with the children to Guatemala for a final custody determination. In the event Respondent decides not to return with the children to Guatemala, Respondent must timely deliver the children to the Petitioner (or another Court-approved caregiver) at a time and place to be determined subsequently so that the children may accompany Petitioner back to Guatemala.
   b. If the parties do not agree as to the timing of this transfer, they may petition the court. If any such petition is filed, the petitioner shall immediately notify Victoria Ericksen by e-mail at Victoria_Ericksen@wawd.uscourts.gov when same is filed. The Court expects the parties to cooperate on the timing and mechanisms of the transfer.
3. Prior to that time, it is hereby ORDERED that the children shall not be taken out of the Western District of Washington.
4. Petitioner's request for bond is once again DENIED.

DATED this 18th day of February, 2020.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 10